J-A12015-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| IN THE INTEREST OF: K.M.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.S. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1831 WDA 2019 |

Appeal from the Order Entered November 13, 2019
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000054-2019

| IN THE INTEREST OF: D.M.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.S. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1832 WDA 2019 |

Appeal from the Order Entered November 13, 2019
In the Court of Common Pleas of Allegheny County Civil Division at
No(s): CP-02-AP-0000055-2019

| IN THE INTEREST OF: A.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.S. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1833 WDA 2019 |

Appeal from the Order Entered November 13, 2019
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000056-2019

BEFORE: KUNSELMAN, J., KING, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                    FILED MAY 28, 2020

Appellant, S.S. ("Mother"), files this appeal from the orders dated November 13, 2019, and entered November 21, 2019, in the Allegheny County Court of Common Pleas, granting the petition of the Allegheny County Office of Children, Youth and Families ("CYF") and involuntarily terminating her parental rights to her children, K.M.B., born June 2003, D.M.S., born September 2006, and A.S., born September 2011 (collectively, "Children"), pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(8) and (b).[1] After review, we affirm.

In its opinion, the trial court fully and correctly set forth the relevant facts and procedural history of this case. Orphans' Ct. Op., filed January 24, 2020, pp. 1-6. For the convenience of the reader, we note that Mother, who has nine children, has a lengthy history with agencies in both the Commonwealth of Pennsylvania and the State of Ohio. Id. at 2; Joint Ex. A. Mother's parental rights were terminated to one of the children, who was

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] By separate decree dated and entered same date, the orphans' court also involuntarily terminated the parental rights of K.B., the father of K.M.B., pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b); the parental rights of K.B., L.D., and an unknown Father to D.M.S., pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8) and (b); and the parental rights of Q.B. and an unknown Father to A.S., pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). No father to any of the Children has filed an appeal from these orders or participated in the instant appeal.

subsequently adopted; four other children, not the subjects of the instant appeal, were removed from her care. Orphans' Ct. Op., pp. 1-6.

The three Children who are the subjects of the instant appeal were adjudicated dependent on August 14, 2017, following reports that Mother lacked safe, clean, and stable housing; that Mother was not providing adequate sustenance for Children, and that Children were truant. Id. Specifically, Mother's housing was uninhabitable, such that she was forced from the home due to code violations which included structural problems, a leaking roof, and malfunctioning electrical fixtures. Id. In addition to the structural issues, the home was filthy, with food, trash, dog feces, and piles of clothing strewn throughout the living area. Id. Services were offered to Mother; specifically, it was recommended that Mother engage in intensive outpatient services for drug and alcohol treatment. Id.

At the dependency adjudication, Mother was ordered to work with the family team and various services offered; attend drug and alcohol treatment and sign releases; schedule well-child visits for Children; allow an Alliance for Infants appointment; cooperate with CYF; and ensure that Children attended school. Joint Ex. A.

At a permanency review hearing in November 2017, Mother had made some progress and was moderately compliant with her goals. Orphans' Ct. Op., pp. 1-6. The home conditions were greatly improved, but Mother continued to test positive for tetrahydrocannabinol ("THC"). Joint Ex. A. Mother was incarcerated on charges relating to drunkenness and endangering

the welfare of a child following an alleged assault on an adult daughter and grandchild. Orphans' Ct. Op., pp. 1-6.

On December 5, 2017, CYF obtained an order for emergency protective custody of Children, who were removed from Mother's care and placed in a foster home. Id. Mother's goals for reunification were to remain employed, undergo drug and alcohol treatment, including cooperating with random drug screens; attend mental health treatment for her bipolar disorder and treat with a psychiatrist; obtain stable housing; address issues of domestic violence; and work on parenting skills. Id.

Additional permanency review hearings were held in January 2018, May 2018, September 2018, January 2019, and March 2019. In January 2018, Mother was making moderate progress towards reunification and was moderately compliant with the permanency plan. See Permanency Review Order, 1/26/18, at 1. In May 2018, Mother was making moderate progress towards reunification but was minimally compliant with the permanency plan. See Permanency Review Order, 5/4/18, at 1-2. She had not done intensive outpatient for dual diagnosis, and had attended one drug screen and tested positive for THC. Joint Ex. A. Mother was attending anger management through Three Rivers Adoption Council ("TRAC"). Id. Mother was ordered to attend drug and alcohol and submit to two screens a month; test negative for illegal substances; follow dual diagnosis recommendations; attend parenting classes; visit with Children through TRAC only; refrain from contacting the

foster mother directly; and avoid discussing the case with those not involved. Id.

In September 2018, Mother was making moderate progress towards reunification and was moderately compliant with the permanency plan. See Permanency Review Order, 9/21/18, at 1. Mother was attending visits at TRAC and attending Mon Yough for mental health and drug and alcohol treatment. Joint Ex. A. Although intensive outpatient dual diagnosis treatment had been recommended, Mother stated that she would not go. Id. Mother was on probation for a year. Id. Mother was ordered to implement all of Gregory Lobb, Ph.D.'s, recommendations; get dual diagnosis treatment and attend screens twice per month; visit with Children once a week at TRAC and twice a week at CYF. Id.

In January 2019, Mother was making minimal progress towards reunification and was moderately compliant with the permanency plan. See Permanency Review Order, 1/11/19, at 1. Mother was not attending intensive dual diagnosis treatment, and one of Mother's adult children, L., was living in the home and had been found by a criminal court in Ohio to be a sexual predator. Joint Ex. A. Mother was ordered to attend intensive outpatient dual diagnosis treatment and attend two drug screens per month; continue visitation as ordered; and that L. was not to be around Children. Id.

On March 15, 2019, CYF filed petitions to terminate Mother's parental rights to Children pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8) and (b). The Orphans' Court held hearings on the petitions on November 13, 2019.

Mother, represented by counsel, was present and testified on her own behalf.[2] In support of its petitions, CYF presented the testimony of Gregory Lobb, Ph.D., the licensed psychologist who performed psychological and interactional evaluations with the family in 2018 and 2019; Tiffany Patrick, CYF caseworker; and Holly Muffett, senior case manager at Auberle Foster Care. Children were not present at the hearing, but were represented by Raymond Sanchas, Esquire, as legal counsel. All parties entered a series of stipulations into the record as Joint Exhibit A. N.T., 11/13/19, at 115.

Tiffany Patrick testified that she is a caseworker employed by Allegheny County CYF and has been the assigned caseworker for the family since April 2017, when the family's case was opened following reports of domestic violence between Mother and her adult son, deplorable housing, and Mother's intoxication. N.T., 11/13/19, at 117-18, 121. She described to the court the circumstances in which Mother's home was investigated, the deplorable conditions in which the home was found, the extensive services and resources provided to Mother, and the various orders Mother was to follow in order to have the case closed. Id. at 123-27.

Mother was ordered to undergo mental health treatment and a drug and alcohol evaluation. Id. at 129-30. Mother was recommended intensive

_____

[2] None of the named or unnamed fathers was present or represented by counsel. There was extensive testimony regarding CYF's efforts to find and notice fathers. See N.T., 11/13/19, at 3-40. Ultimately, the court found that reasonable efforts, including publication, were made, and that L.D. and Q.B. were served by publication and that K.B. was personally served. Id. at 40.

outpatient services, which Mother, who had tested positive for THC, refused. Id. Mother advised Ms. Patrick that she had been smoking marijuana since the age of twelve and would not stop. Id. at 130. Mother obtained new housing but it was still inappropriately dirty, with food, trash, debris, and dog feces laying out. Id. at 130-31. Children were removed in December 2017, following Mother's incarceration on charges related to public drunkenness, simple assault and endangering the welfare of a child. Id. at 131. At that time, in-home services, which Mother had been utilizing since April, were ended. Id. at 134.

Mother's initial goals, created by the family team, were to remain employed and ensure financial stability; cooperate with mental health treatment, work with a psychiatrist, and attend domestic violence counseling; cooperate with drug and alcohol treatment; attend random screening; attend parenting classes; and maintain housing in an appropriate level of cleanliness. Id. at 135-36. Mother had difficulty maintaining employment; admitted to smoking marijuana with K.M.S; and had been diagnosed with depression but was not currently on medication. Id. at 139-40. Mother had issues with anger and would go from calm to screaming and yelling. Id. at 141. The family team assisted with the payment of Mother's rent in April 2018; provided Mother with transportation to get to and from therapeutic visitation with Children and to her mental health and drug and alcohol counseling. Id. at 142.

With regard to Mother's goal of stable employment, since the case was opened, Mother has had six jobs that CYF was aware of. Id. at 143-44. At the time of the hearing, Mother was currently employed. Id.

With regard to Mother's drug and alcohol goals, Mother was referred for intensive outpatient treatment in November 2017 and January 2018 but did not attend or complete treatment. Id. at 144-46. It was not until September 2018 that Mother began attending, and eventually completed, intensive outpatient treatment at Mon Yough. Id. at 146. Mother was stepped down to outpatient treatment, but to Ms. Patrick's knowledge, was still in treatment at the time of the hearing; Mon Yough would not give Ms. Patrick information regarding their recommendations, how often Mother attends, or what level of treatment Mother attended. Id. at 146-47. Mother was called in for twenty-six urine screens and attended only four. Id. at 149. All of her screens were positive for THC. Id. Prior to the termination hearing, Mother declined a screen because she stated that it would still be positive. Id. at 148. Mother admitted to smoking marijuana until October of 2019, despite the fact that the termination petition was filed in March 2019. Id. Ms. Patrick testified that she has seen a change in Mother, and that Mother was very proud that she had ceased using marijuana. Id. at 159. However, Ms. Patrick remained concerned that the change had been very recent and that "[t]here hasn't been anything really substantiated" for any length of time. Id.

With regard to Mother's mental health goals, Ms. Patrick testified that Mother did not attend a clinical evaluation until March 2019. Id. at 150.

Although Mother stated that she had attended Turtle Creek Valley Mental Health for treatment, Ms. Patrick was not able to verify that. Id. Mother did attend one hour of counseling and anger management prior to her weekly therapeutic visitations with Children. Id.

With regard to Mother's goal of obtaining appropriate and stable housing, Ms. Patrick testified that, since she became involved in the case in April 2017, Mother has lived in three different houses and was, at the time of the hearing, residing in a homeless shelter. Id. at 151. Mother was living with L. and L.'s child. Id. Ms. Patrick testified that Mother told her about L.'s abuse of K.M.B. when K.M.B. was approximately eight or nine years old. Id. at 137-38. K.M.B. confirmed that the abuse occurred. Id. at 138-39. Mother informed Ms. Patrick that she was working on a lease for an apartment with an October 2019 move-in date, but, at the time of the hearing, Ms. Patrick was unaware of the status of that lease. Id. at 152.

Ms. Patrick testified that foster mother gained secondary decision-making for Children in May 2018, because there were issues with Mother. Id. at 152. Mother was "communicating things" to a cousin of Children, who then bullied K.M.B. at school. Id. at 152-53. Rumors were spread about K.M.B. and that she "needed to go back home to [Mother]." Id. at 153. The bullying was so severe that K.M.B. was forced to change schools. Id. at 153-54. Additionally, there were delays in Children obtaining necessary medical appointments because Mother could not be contacted for consent. Id. at 154.

With regard to Mother's parenting goals, Ms. Patrick noted that TRAC supervised visitation was discharged in the summer of 2019. Id. However, completing the TRAC program was insufficient to meet Mother's parenting goal. Id. at 155. Mother could not translate the skills she had learned at TRAC into supervised visitation with Auberle or CYF, and conflict continued during the visits. Id. at 155. At the time of the termination hearing, CYF had continuing concerns regarding Mother's mental health, substance abuse, housing, and employment issues interfering with her ability to parent. Id.

Mother appeared to have difficulty understanding that L. should not be around Children and the severity of what had occurred. Id. at 156-57. When Ms. Patrick was examining Mother's home to determine if it was safe for visitation, Mother showed Ms. Patrick a section of the attic where L. had a room. Id. Ms. Patrick had spoken repeatedly with Mother that L. could not be around Children, but Mother stated that "it was only temporary." Id. at 157. However, L. was using Mother's address as her reporting address for probation. Id. Ultimately, Ms. Patrick was not able to recommend anything outside of supervised visitation due to L. residing in the home. Id. Despite all of this, recently, L. had been present at the end of a visit between Children and Mother. Id. at 157-58. L. was present in the parking lot and Mother encouraged the contact rather than attempting to shield Children from her. Id. at 158. Mother has stated on multiple occasions that she did not feel Children should be separated from L., because the incident occurred when L. was fourteen or fifteen years old. Id. K.M.B. is still very uncomfortable

around L. and has said that she feels Mother is choosing L. over K.M.B. Id. Mother has never been able to obtain unsupervised visitation. Id.

With regard to Mother's domestic violence goal, Mother was unable to provide documentation that she completed domestic violence treatment. Id. Mother had advised Ms. Patrick of domestic violence between herself and her paramour, but when Ms. Patrick made a referral to Women's Center & Shelter, Mother declined their services. Id. at 159.

Ms. Patrick testified that Children have a parent/child relationship with their foster mother, who is committed to them and ensures that their needs are met. Id. at 165. CYF believes that foster mother is an appropriate adoptive resource. Id. at 166. Ms. Patrick spoke with Children on multiple occasions about adoption, referred Children to child prep, and the child prep worker met with Children. Id. at 171. Children have an adoption caseworker who has begun the home study process. Id. In Ms. Patrick's opinion, termination and adoption can provide Children with stability that another option cannot. Id. at 171-72. Ultimately, Ms. Patrick testified that K.M.B. wishes to be adopted but that D.M.S. and A.S. do not wish to be adopted but, if they could not go home to Mother, they would want to stay with foster mother. Id. at 203-07.

Ms. Patrick noted that, in the past, she has heard Mother telling Children what to say, including to request overnight visits. Id. at 207-11. Children stated that they do not want to come to hearings "because they have been

told what to say. So they would rather go to school than be put in the middle." Id. at 211.

Gregory Lobb testified that he performed psychological evaluations and interactional evaluations with the family in April or May of 2018, and, more recently, in September and October of 2019. N.T., 11/13/19, at 46; CYF Ex. 1. Dr. Lobb described Mother's drug use, reported in 2018, as marijuana usage on a daily basis. Id. at 48. Mother claimed marijuana helped her "cry less. Become less aggravated. And [have] fewer mood swings." Id. Mother was adamant that marijuana was going to be part of her life forever and had no intention of ceasing her usage. Id. at 51. Dr. Lobb did not believe this was an appropriate usage because Mother did not have a medical marijuana card. Id. at 49-50. As of October 2019, Mother reported that she had not used marijuana for two weeks and two days, and had changed the way she thought about drug usage. Id. at 51. Mother had also reported that, although she had not used alcohol since her criminal charges, prior to those charges, she had been using alcohol as a coping mechanism. Id. at 50.

Based upon his evaluations of Mother, Dr. Lobb diagnosed her with bipolar disorder, cannabis use disorder, alcohol use disorder. Id. at 51. In 2018, Mother's mental health was unstable because she was not participating in the appropriate level of treatment. Id. at 52. Accordingly, her ability to parent Children was impacted. Id. In 2019, Mother had completed some drug and alcohol treatment through Mon Yough, although her clean date was very new. Id. at 53. Mother was seeing a therapist and had seen a

psychiatrist. Id. Mother became homeless at some point and missed appointments with the psychiatrist, and was off medication, but Dr. Lobb believed this was appropriate treatment. Id.

Dr. Lobb testified that when he evaluated Mother in 2019, Mother reported living in a homeless shelter with L. and L.'s newborn child. Id. at 53-54. Mother and L. planned to sign a lease for a two-bedroom apartment. Id. at 54. Dr. Lobb had concerns about this arrangement because L. is not permitted to be around Children, due to L.'s past sexual abuse of K.M.B. Id. Mother did have an understanding of the seriousness of the allegations against L., but "[s]he doesn't agree with it, that [Children] shouldn't be around [L.] . . . She doesn't believe that the children should be around her unsupervised, but believes that they could be around her in a supervised setting." Id. Dr. Lobb testified that he could not offer an opinion as to whether that was an appropriate response, or whether Mother could keep Children safe from L., because he did not know the specifics of the allegations and had never met L. Id. at 54-55.

Dr. Lobb's opinion was that, in 2019, Mother was making a "good step" towards stability because she had a date she was planning to sign a lease for an apartment. Id. at 55. However, during the evaluation, Mother was still living in a homeless shelter and the lease had not yet been signed. Id. Mother had employment, but it was relatively new, and Mother had instability in maintaining employment since Dr. Lobb had known her. Id. When asked whether there was an improvement between the 2018 and 2019 evaluations,

Dr. Lobb stated, "I think there is hope for improvement. It appears that is the right direction to go. My reservation is that we don't have any hard evidence of that at this point." Id.

Regarding the relationship between Children and Mother, Dr. Lobb testified that the extended separation

> [has] created a situation where they have a hard time understanding or trusting kind of what is going to happen next. And causing sort of attachment issues that have come up. They want to. They love their mother. They want to trust her. They want to believe that things are going in the right direction and they are going to be better. But they have also been disappointed with that over this almost two years now.

Id. at 60.

Regarding the relationship between K.M.B. and Mother, Dr. Lobb testified that although their relationship had improved over time, Mother and K.M.B. had an avoidant attachment style,

> formed and developed over time when a child feels that a parent or caregiver is emotionally unavailable to them. Rejecting at times to them.

> Children learn how to protect themselves from their sort of emotional unavailability and unresponsiveness. And they try to become more independent. I think [K.M.B.] has developed that. She's a very independent 16-year old and is proud of that . . .

> [Mother and K.M.B. have] a bond, but [K.M.B.]'s created a sort of distance from that so that she doesn't get hurt. She wants to have that relationship with her mom. She wants to continue to see her mom, but she also has a need to protect herself.

Id. at 61-63. K.M.B. wanted a relationship with Mother, but also wanted the stability she had gained with foster mother, was doing well in foster mother's

home, and wished to stay there. Id. at 61-64. K.M.B. had a secure attachment with foster mother. Id. at 66. In Dr. Lobb's opinion, the relationship between K.M.B. and Mother was not beneficial at the time of the hearing. Id. at 64. While the relationship could be beneficial, it would require that Mother "[stay] in the race with mental health, drug and alcohol treatment, maintain stability in the other facets of her life." Id. Dr. Lobb did not believe the relationship was necessary, and termination would not have a negative effect on K.M.B. Id.

Regarding the relationship between Mother and D.M.S., Dr. Lobb described their attachment style as "ambivalent and anxious." Id. This was "due to not having her mother available to her as she needed. And at times not properly nurturing her. Even being insensitive. Children with this kind of attachment style grow up feeling confused and insecure and they don't know what to expect from the parent or caregiver." Id. at 65. D.M.S. wishes to return to Mother's custody. Id. Dr. Lobb did believe that D.M.S. and Mother had a bond that was necessary and beneficial, and that, if the bond were terminated, D.M.S.' therapist would need to be involved. Id. D.M.S. also had an ambivalent and anxious attachment style with foster mother, and that it was possible that D.M.S.' anxiety and insecurity contributed to her desire to return to her mother. Id. at 66. Dr. Lobb stated that he believed that the best outcome for D.M.S. would be if Mother could follow through and maintain her stability for another six to twelve months, but admitted he was aware that Children had been out of Mother's care for almost two years, and that Mother's

progress was very recent. Id. at 67, 110. Regardless, D.M.S. should not remain in foster care indefinitely, and required permanency. Id. at 68.

With regard to the relationship between A.S. and Mother, Dr. Lobb described it as ambivalent and anxious. Id. at 68. A.S. wants to rely on Mother but has been disappointed before and cannot count on Mother. Id. Dr. Lobb also believed that A.S. and Mother had a necessary and beneficial relationship and that termination would be detrimental to A.S., because she had a strong desire to return to Mother. Id. at 69.

Dr. Lobb testified regarding all three girls' behavioral difficulties, noting that K.M.B. struggles to control her anger and can be willful and independent to a fault, and has been on probation at school for fighting. Id. at 56, 63, 113. D.M.S. persistently steals items and is "defiant and disrespectful." Id. at 58-59. D.M.S. and A.S. fight repeatedly and viciously. Id.

Dr. Lobb stated that allowing D.M.S. and A.S. to remain in foster care for another six to nine months while Mother developed stability would keep them in limbo, which was not healthy for them, either. Id. at 69. If Mother were able to develop that stability, it would outweigh the additional time spent in care. Id. Dr. Lobb believed that should Mother be given an additional opportunity, it should be her last. Id. Dr. Lobb testified that Mother's conversations with Children regarding returning home were not appropriate because it would raise Children's hopes, and that this could have an effect on their attachment style. Id. at 70-71. If Mother's rights were terminated, D.M.S. and A.S. could be assisted with therapeutic services. Id. at 73. As of

the 2019 evaluation, Mother had not developed the capacity and stability to parent Children. Id. at 72-73. Most of Dr. Lobb's hopes for Mother's stability were based upon a change in her attitude, not upon any long-term showing of progress. Id. at 112.

Holly Muffett testified that she is employed by Auberle as a senior case manager. Id. at 216. She described her responsibilities as "a liaison between bio mom, foster mom and CYF." Id. Ms. Muffett also set up visitations at her office, and observed at least a dozen visits between Children and Mother. Id. at 217. When she does not observe a visit, a case aide observes, and writes a report that Ms. Muffett later reviews. Id. Ms. Muffett never overhead Mother coaching Children, but often heard her mention to Children, at visits, that Children would be returning home. Id. at 217-18. This occurred as recently as September of 2019. Id. In Ms. Muffett's opinion, conversations such as this contributed to Children's confusion: at Auberle, talking about the case or going home is against the rules. Id. at 218.

Ms. Muffett observed L. at a visit only once, in October 2019. L. was waiting outside with a baby in a stroller, and talked with Mother while D.M.S. played with the baby. Id. at 219. K.M.B. said only a few words but went straight to the car. Id. It took Ms. Muffett a while to get Children into the car to make sure they did not have any contact with L. Id. Ms. Muffett asked K.M.B. if she was okay, and K.M.B. shrugged and went back to looking at her phone. Id. at 220.

Ms. Muffett has also observed Children, specifically A.S. and D.M.S., fighting with each other. Id. at 221-22. At times, during visits, A.S. and D.M.S. throw things at each other and destroy property; D.M.S. has broken the vending machine by punching it, climbed the gate into the air conditioning unit, written on the walls, and dented the walls. Id. Mother has not been able to redirect Children during those times, and visits have been cut short because the case aides cannot handle the behavior either. Id. Children do not require as many redirects with foster mother, but are still "wild" in the foster home. Id. at 223. Foster mother is meeting all of Children's needs. Id. at 223.

Mother testified that she has always had Children in her care, with the exception of K.M.B., who was taken out of her custody in Ohio State for three weeks when she was approximately three weeks old. Id. at 237. Mother claimed that recently she "actually sat down and thought about the goals and asked at the last team meeting more in-depth about the goals. Because I was confused about some of the things I thought I was doing and I wasn't doing." Id. at 238.

Mother testified that she attended drug and alcohol treatment at Turtle Creek Valley, but she became frustrated after they cancelled several appointments, and quit the program. Id. at 239. "Several months" later Mother began attending treatment at Mon Yough. Id. Mother stated that she had completed drug and alcohol counseling "about four months ago" but was still going to Mon Yough for mental health treatment. When asked whether

she had obtained documentation of her completion, Mother stated, "I can get verification. But, no, I signed releases for them to send to CYF." Id. at 240-41. Mother admitted that, although she had a clean date from marijuana of October 2019, Mon Yough's last screens would have still been positive for marijuana. Id. at 241. Mother claimed that her main goal was alcohol, and she had not had alcohol since December 2017. Id. at 241-42. Mother claimed that Mon Yough encouraged her to get a medical marijuana card, but that, since she has gotten clean, getting a card would be "an excuse to use." Id. at 242. Mother stated that prior to October 2019, she had a mindset from "day one" that she was not going to quit smoking because she was self-medicating. Id. at 243. However, she is currently on psychiatric medication and treating with a psychiatrist once every three months, and her therapist once a week. Id. Mother claimed to have made progress in controlling her anger and had obtained full time employment as a customer service manager. Id. at 246-47. Mother testified that she is no longer on probation. Id. at 261.

Mother stated that she was living in a homeless shelter, but hoped to sign her paperwork the day after the hearing and move into her home by the end of the month. Id. at 249. Mother's counsel asked "no matter how you are putting the names on the leases or whatever, is this a home that is just going to be for you?" to which Mother responded "yes." Id. at 249-50. Asked whether L. understood that, Mother replied "yes." Id. at 250. When questioned about the incident where L. came to Auberle, Mother stated, "I told

her she wasn't allowed to be there around the kids." Id. However, Mother stated that she wanted L. to be able to have supervised contact with Children. Id. When asked to explain, Mother stated, "For the baby actually. It's not for [L.] I want my kids to have a relationship with her child. I understand [CYF] don't want [L.] around. And I have no problem with that." Id. at 250-51.

Mother testified that she wants Children to come home, and understands that she cannot have "any slip ups." Id. at 257-58. Mother believed she would be able to deal with the stress of raising three children, and was willing and committed to dealing with all of the issues that had come up during the dependency and ask for help if necessary. Id. at 258-59. With regard to K.M.B., Mother stated that "I'm trying to look at [K.M.B.'s] best interest right now. And that's what she wants. And if that's what she wants, I'm not going to force her or make her come home. She's comfortable. [K.M.B.] had came a long way in these last few years and I don't want to up turn that." Id. at 262. Mother stated she was "in agreement" with K.M.B. staying at foster mother's home Monday through Friday until she finished high school, but did not want her parental rights terminated. Id. at 257-65.

At the conclusion of the hearing, Attorney Sanchas stated that he was opposing the termination of Mother's parental rights. Id. at 288. Attorney Sanchas stated that A.S. wants reunification and to remain with D.M.S., and that D.M.S. represented to him that she would not sign a consent to adoption. Id. at 289. Indeed, Attorney Sanchas stated that "no one ever at any point told her that her . . . written consent would be required for an adoption to go

through." Id. As Mother was clean and sober, it seemed unlikely that D.M.S. would want to sign a consent. Id. at 290. Attorney Sanchas stated that although K.M.B. wants to be adopted, she wants an open adoption with overnight visits with Mother, and that it did not appear foster mother would allow overnights. Id.

At the conclusion of the hearing, the court terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(8) and (b). Mother timely filed notices of appeal and statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Mother presents the following issues for our review:

1. Did the [Orphans' Court] abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(8)?

2. Did the [Orphans' Court] abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of [Children] pursuant to 23 Pa.C.S. §2511(b)?

3. Did the [Orphans' Court] abuse its discretion and/or err as a matter of law in holding that [Children] were not parties to the termination proceeding?

See Mother's Brief at 11 (answers omitted).

We note the relevant standard of review.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse

of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

In re T.S.M., 71 A.3d 251, 267 (Pa. 2013) (internal citations and quotations omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act.

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

In re L.M., 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." In re C.S., 761 A.2d 1197, 1201 (Pa. Super. 2000) (en banc) (citation omitted).

The trial court terminated Mother's parental rights to Children pursuant to 23 Pa.C.S. § 2511(a)(8) and (b). In order to affirm a termination of parental rights, we need only agree with the trial court as to any one

subsection of Section 2511(a), as well as Section 2511(b).  In re B.L.W., 843 A.2d 380, 384 (Pa. Super. 2004).  The relevant section of the statute provides as follows:

> (a)   General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * *
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> * * *
>
> (b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(8), (b).

With regard to Section 2511(a)(8),

> In order to terminate parental rights . . . the following factors must be demonstrated:  (1) The child has been removed from parental care for 12 months or more from the date of removal;  (2) the conditions which led to the removal or placement of the child continue to

> exist; and (3) termination of parental rights would best serve the needs and welfare of the child.
>
> In re Adoption of M.E.P., 825 A.2d 1266, 1275–76 (Pa. Super. 2003). "Notably, termination under Section 2511(a)(8), does not require an evaluation of [a parent's] willingness or ability to remedy the conditions that led to placement of her children." In re Adoption of R.J.S., 901 A.2d 502, 511 (Pa. Super. 2006) (citations omitted).

In re Adoption of C.J.P., 114 A.3d 1046, 1050 (Pa. Super. 2015).

Mother contends that, despite her initial lack of progress after Children were removed, there has been considerable evidence as to Mother's compliance and progress since. See Mother's Brief at 24. Mother argues that she engaged in drug and alcohol treatment within twelve months of Children's removal, and that she worked with TRAC on her parenting skills and anger management. Id. Mother contends that, although Mother did not obtain independent housing, that fact alone is insufficient to terminate her rights. Id. Mother admits she did not stop smoking marijuana until October 2019, but contends that Dr. Lobb testified that smoking marijuana alone does not render a parent incapable of parenting. Id.

With regard to its Section 2511(a)(8) findings, the Orphans' Court noted

> [this court] has set forth the facts that found and which demonstrate that Mother, despite the passage of substantial time, has not been able to remedy the conditions that led to [Children's] removal. Mother has some support in her argument from the testimony of the psychologist in that he recommended termination of rights as to [K.M.B.], but he did not for [D.M.S. and A.S.]. The [c]ourt did not credit the psychologist's testimony in this regard. He advocated that Mother had shown a change of attitude and should be given one last chance with another six to nine months of time. Importantly, however, [Children] have been in care for 28 months at the time of the hearing[,] and the psychologist was

- 24 -

unaware of the actual length of CYF involvement when he made this suggestion. Moreover, when pressed, it was clear that his view rested entirely on Mother's change of attitude and cessation of marijuana usage, all of which occurred just in the weeks before the final hearing and long after the termination petition was filed in March of 2019. Under the law, with respect to a petition filed under Subsection (a)(8), this court "shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S. § 2511(b). See also, e.g., C.J.P., 114 A.3d 1046, 1050, 1053 (upholding termination of rights under Subsection (a)(8) and observing that Mother's recent efforts to comply with goals after nearly three years of noncompliance post-dated the petition for termination of her rights and could not be considered).

Even without the legal prohibition on considering Mother's 11th-hour changes, in this [c]ourt's view, CYF took the better view in that Mother's very recent changes could not become a foundation for trust after Mother's long course of inability to meet her goals or make substantial progress. As noted previously, the psychologist had to admit that Mother's view that [Children] could be together with L., who had sexually abused [K.M.B.], even in supervised settings, was not healthy or realistic . . . Likewise, at the beginning of the hearing, Mother showed similar poor judgment when she objected to termination of the rights of [Children's] fathers and putative fathers, with whom they have no contact, even though Mother testified: "They are all drug dealers . . . ." The psychologist also agreed that Mother, even as of the hearing date in November of 2019, was not ready for unsupervised visitation with [Children].

To this [c]ourt, Mother's inability to have [Children] unsupervised this far into the case did not speak to the likelihood of Mother's parental success after years of insufficient progress. See, e.g., Adoption of J.N.M., 177 A.3d 937, 939-40, 943-44 (Pa. Super. 2018) . . .

See Orphans' Ct. Op., 1/24/20, at 8-10 (internal citations to the record omitted).[3]

We discern no erring in the court's findings. Per the statute, the court may not consider post-petition conduct. In re D.W, 856 A.2d 1231, 1234 (Pa. Super. 2004); 23 Pa.C.S. § 2511(a)(8), (b). The petitions were filed on March 15, 2019 and, at the time of the filing, Children had been in care almost nineteen months. At the time of the hearing, Children were in care for twenty-eight months. At the last permanency review hearing prior to the filing of the petitions, Mother was making minimal progress towards reunification and was not attending intensive dual diagnosis treatment and was allowing L. to be around Children. See Permanency Review Order, 1/11/19, at 1. Mother was still returning positive drug screens at that time and, at the termination hearing, admitted that she did not stop smoking marijuana until October 2019, almost eight months after the filing of the petitions. N.T., 11/13/19, at 240-41. Although Mother had stopped smoking marijuana as of the date of the hearing, her sobriety was very new – only about two weeks – and she had used marijuana for most of her adult life. Id. at 241-43. Mother had not obtained suitable housing for Children at the time of the filing of the petitions, or by the time of the hearing. Id. at 151-52. Indeed, at the time of the hearing, Mother was living in a homeless shelter with L. and L.'s baby. Id.

_____

[3] We will further discuss the trial court's findings regarding Children's needs, welfare, and best interests in the Section 2511(b) analysis.

Even at the hearing, Mother did not seem to appreciate the fact that L. could not be around Children. Id. at 249-51.

Additionally, the record confirms that terminating Mother's parental rights would best serve the needs and welfare of Children. At the time of the termination hearing, evidence showed that Children had a parent/child bond with foster mother, who has been meeting their needs. Although D.M.S. and A.S. testified that they wished to return to Mother's care, Mother had not been able, in a period of almost two and a half years, to remedy her problems. Although Mother had very recently alleviated one of the conditions leading to Children's placement, there was no evidence presented that Mother would be able to sustain this recovery long-term. Children suffered from confusion and behavioral problems while in the long-term limbo between Mother and foster mother. It would not serve Children's needs and welfare to place their lives on hold any longer. See M.E.P., 825 A.2d at 1276 ("A child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.").

Accordingly, clear and convincing evidence supported the termination of Mother's parental rights pursuant to Section 2511(a)(8), based upon the fact that Children were out of Mother's care for twelve months, that the conditions leading to the placement of Children still existed, and that termination would best serve Children's needs and welfare. C.J.P., 114 A.3d at 1050.

Mother next argues that the trial court erred in finding that termination would best serve Children's needs and welfare. See Mother's Brief at 25.

Mother contends that Dr. Lobb's evaluations showed that the bond between K.M.B. and Mother had improved, and that K.M.B. wanted to continue her relationship with mother. Id. at 25. Mother argues that the bond between Mother and D.M.S. and A.S. was necessary and beneficial and the termination of Mother's rights would be detrimental to the girls. Id. at 25-26. Mother avers that Children were already receiving services and their behavior has not improved, so the notion that counseling could help them is speculative at best. Id. at 26-27.

The Courts have stated:

[I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." [T]he determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond.

In re T.S.M., 71 A.3d at 267 (citations omitted). The court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." In re Z.P., 994 A.2d at 1121. The court is not required to use expert testimony, and social workers and caseworkers may offer evaluations as well. Id. We also consider whether the bond is healthy or unhealthy, and whether a parent affects the child's ability to form an attachment to a foster family

who can provide the necessary love, care, and stability that the child has needed. T.S.M., 71 A.3d at 270–71.

> "While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child." [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent . . . .

In re Adoption of C.D.R., 111 A.3d 1212, 1219 (Pa. Super. 2015) (citations omitted).

> The court observed:

> Mother's argument that terminating her rights would not serve [Children's] needs and welfare was also unavailing. The psychologist did admit that the foster mother was an appropriate adoptive resource and that she was meeting [Children's] needs. He also stated that therapy can assist with the emotional turmoil of having Mother's rights terminated. In fact, other witnesses confirmed that the foster placement is good for [Children], that they feel comfortable in the home and that the foster mother successfully exerts more control and direction over [Children's] negative behaviors. By way of contrast, a witness who transports [Children] to visits with Mother reported that fights break out usually within minutes of arrival and that [D.M.S.] readily begins screaming and throwing and breaking objects. One child, during a visit, broke a vending machine by punching it. Further, Mother improperly tells these girls they will come home to her, and termination will provide finality for [Children]. As recounted above, [Children] are bonded with Mother, but those bonds are characterized by anxiety and ambivalence. See, e.g., In re T.S.M., 71 A.3d 251, 267-69 (Pa. 2013) (reversing denial of mother's termination of parental rights regarding seven children and discussing need for permanence even where children show a significant bond to mother); In re T.D., 949 A.2d 910, 912, 917 920-23 (Pa. Super. 2008) (upholding termination of parents' rights to their 11-year-old son, reasoning in part that the child had been out of the parents' care for more than two years and noting

that the child's interests would be served by adoption despite the child's loyalty to his parents and expressed ambivalence about adoption).

See Orphans' Ct. Op., 1/24/20, at 10-11 (internal citations to the record omitted).

We see no error of law or abuse of discretion in this conclusion. There was testimony that all three Children share parent/child bonds with Mother. However, as noted above, we may emphasize the safety needs of Children as well as intangibles such as the stability and permanence a foster parent may offer. C.D.R., 111 A.3d at 1219.

In the instant case, Children's safety needs are best served by termination. In addition to the facts emphasized by the Orphans' Court, we note that, although Mother had, at the time of the hearing, obtained a period of sober time, Mother had not demonstrated extended sobriety in the twenty-eight months that Children were in care, leaving her ability to maintain that level of functioning in doubt. Additionally, Mother still did not appear to understand that L. could not be near Children, despite court orders and K.M.B.'s documented discomfort at L.'s presence. Thus, Children's safety in her care remains in doubt.

Finally, there was extensive testimony that Children were ambivalent and confused about whether they wished to be adopted or not; Mother did not help in this confusion by repeatedly telling Children they would come home to her, or discussing the particulars of her case with them, despite being told not to do so. As noted, above, we have terminated parental rights where an

unhealthy bond with a parent has prevented a child from forming a healthy attachment with a foster family. See, e.g., T.S.M., 71 A.3d at 270–71. Here, Children desperately need stability, permanency, and assistance in dealing with their various psychological issues and destructive behaviors. Mother simply has not shown that she is capable of providing that stability. Id. After twenty-eight months in care, it is in Children's best interests that Mother's rights be terminated. Id.

Thus, the record supports the Orphans' Court's finding that Children's developmental, physical and emotional needs and welfare favor termination of Mother's parental rights pursuant to Section 2511(b). See T.S.M., 71 A.3d at 267.

In Mother's final issue, she contends that the court erred in finding that Children were "not parties to the termination proceeding." See Mother's Brief at 27. Mother's argument is convoluted, but she appears to argue that the court erred in excluding certain statements of Children but admitting other statements of Children. Id. Mother argues that the exclusion of Children's statements regarding needs and welfare was error and prejudiced Mother's ability to present a case and argument as to Section 2511(b). Id.

Prior to determining the merits of Mother's issue, we must first determine whether she has preserved it for purposes of appeal. See Commonwealth v. Wholaver, 903 A.2d 1178 (Pa. 2006) (holding this Court may sua sponte determine whether issues have been properly preserved for appeal). To preserve an issue for appeal, an appellant must preserve it in the

lower court. See Pa.R.A.P. 302(a) (issues not raised in the lower court are waived and cannot be raised for the first time on appeal).

Following a review of the record, it appears that the exchange Mother refers to occurred when counsel for CYF asked Ms. Patrick whether CYF had spoken to Children about whether or not they would consent to adoption prior to filing the termination proceedings. See N.T., 11/13/19, at 167. Raymond Sanchas, Esquire, counsel for Children, objected to testimony regarding Children's preferences as hearsay. Id. Lilian Akin, Esquire, counsel for CYF, responded that "they are a party to this. This case is about them. [Children] cannot be force[d] to testify and I don't think it's appropriate to bring a child to a TPR hearing. But I think whether or not they want to be adopted is an issue for this hearing." Id. The following exchange then took place:

> THE COURT: It's an issue, but it is hearsay, isn't it?
>
> MS. AKIN: They are a party.
>
> THE COURT: They are not a party.
>
> MS. AKIN: They are as much a party as the parents [are].
>
> THE COURT: Well, at least in this part of the hearing, the entire focus is on the parents' conduct and their ability to parent their children. We haven't I guess bifurcated the hearing to think about the needs and welfare component. Which at that point, of course, it is relevant.
>
> MS. AKIN: And that's what I'm asking about. I'm getting to needs and welfare right now. So regarding needs and welfare, I think whether or not the children will consent to an adoption is definitely an issue for this hearing.

THE COURT: Mr. Sanchas, as the children's counsel, what was your plan for letting the [c]ourt know your client's view point?

MR. SANCHAS: Well, Your Honor, I believe the law allows me as their counsel to set forth their position. And I intend to do so. Now, what they may or may not have said six months ago to the caseworker when they may or may not even have been advised of her instance [sic] the ability to refuse to sign a consent, I think that's hearsay. And it is not relevant.

The children here are in an odd position because they're a quasi party, but they are not allowed to come in here and address the [c]ourt. When one child was [sixteen and a half] years old. Certainly I think [they] should be able to be heard by Your Honor. But I don't make the law and I don't make the rules. All I can say is I believe it's hearsay. I believe it's inadmissible.

Id. at 167-69. At no point during this exchange did Mother object, either to the admission, or the non-admission, of Children's statements. Accordingly, pursuant to Pa.R.A.P. 302, Mother has waived this issue for purposes of appeal.

However, even if we did not find this issue waived, it would have no merit. The Pennsylvania Rules of Evidence define hearsay as a statement that the declarant does not make while testifying, that a party offers in evidence to prove the truth of the matter asserted. Pa.R.E. 801(c).

As a general rule, hearsay is inadmissible, because such evidence lacks guarantees of trustworthiness fundamental to our system of jurisprudence. The rule against admitting hearsay evidence stems from its presumed unreliability, because the declarant cannot be challenged regarding the accuracy of the statement. Notably, it is elemental that, [a]n out of court statement which is not offered for its truth, but to explain the witness' course of conduct is not hearsay.

In re K.A.T., 69 A.3d 691, 702 (Pa. Super. 2013), appeal denied, 81 A.3d 78 (Pa. 2013) (citations and quotations omitted).

The decision to admit or exclude evidence is within the sound discretion of the trial court. In re A.J.R.-H., 188 A.3d 1157, 1166–67 (Pa. 2018). "Generally, we review a trial court's evidentiary rulings for abuse of discretion[.]" In re C.M.T., 861 A.2d 348, 355 (Pa. Super. 2004). "An abuse of discretion is not merely an error of judgment, but is, inter alia, a manifestly unreasonable judgment or a misapplication of law." In re A.T., 81 A.3d 933, 936 (Pa. Super. 2013) (internal citations and quotations omitted). Such an error is not harmless and the appellant is entitled to a new hearing if, "in light of the record as a whole, an erroneous evidentiary ruling could potentially have affected the decision." In re A.J.R.H., 188 A.3d at 1170.

Here, the Orphans' Court did not admit the statements as they were hearsay; however, any potential error in excluding the statements would not entitle Mother to relief because the error could not have affected the trial court's decision. As explained above, voluminous and conflicting testimony was introduced regarding Children's preferences and desires regarding adoption. However, the court had ample reason to disregard Children's preferences, namely, that the unhealthy bond and attachment between Mother and Children was resulting in the inability of Children to attain any kind of permanence and stability in their foster home. Therefore, as Mother was not prejudiced by any alleged error, she cannot obtain relief on this claim. See, e.g., In re A.J.R.H., 188 A.3d at 1170.

Orders affirmed.

.

J-A12015-20

Judge Kunselman Concurs in the Result

Judge King Concurs in the Result.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/28/2020